***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Rideout and enters the following Opinion and Award:
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. That all parties have been correctly designated, and there is no question as to misjoinder or non-joinder of parties. *Page 2 
2. That all parties are properly before the Industrial Commission; that the Industrial Commission has jurisdiction over the parties and the subject matter; this case is subject to the North Carolina Workers' Compensation Act, and the parties are bound by and subject to the North Carolina Workers' Compensation Act.
3. An employment relationship existed between the plaintiff and the defendant at the time of injury on May 2, 2008, relevant to this claim.
4. Plaintiff's average weekly wage is $370.83, yielding a workers' compensation rate of $247.22.
5. Plaintiff alleges she sustained an injury by accident to her bilateral upper extremities arising out of and in the course of her employment with defendant on May 2, 2008.
6. The compensability of plaintiff's May 2, 2008 claim has been denied by the defendant by way of filing a Form 61.
7. The parties stipulated the following exhibits into evidence: Stipulated Exhibit 1, Pre-Trial Agreement; Stipulated Exhibit 2, Plaintiff's Medical Records; Stipulated Exhibit 3, Industrial Commission Forms and Filings; Stipulated Exhibit 4, Employee File; and Stipulated Exhibit 5, Plaintiff's Responses to Defendants' Discovery Requests.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 56 years with a date of birth of December 13, 1954. Plaintiff has worked only in manufacturing industries such as automotive, textiles, and assembly, since graduating from high school. *Page 3 
2. Prior to working for defendant Adecco, plaintiff was employed by Freightliner for two (2) years. While working for Freightliner, she sustained a compensable injury by occupational disease to her right elbow. Surgery to her right elbow was performed by Dr. Forney Hutchinson on December 12, 2005, and she returned to full duty work without restrictions at Freightliner on March 27, 2006. The December 12, 2005, injury by occupational disease to plaintiff's right elbow is not at issue in this matter.
3. Plaintiff was laid off from Freightliner on March 31, 2007. After being laid off by Freightliner, plaintiff received unemployment benefits and then was hired by Adecco, a temporary agency, on April 7, 2008.
4. Through Adecco, plaintiff was assigned to the Ingersoll Rand plant. Ingersoll Rand manufactures generators that are used in construction. There was a small, medium, and large, assembly line at Ingersoll Rand and plaintiff was assigned to the small line.
5. Plaintiff's job duties consisted of assembling "end caps" on the generators. In assembling the end caps, she used power tools during her entire shift. She used two (2) impact guns, screws and stiffeners. The impact guns were air driven. Thirteen (13) screws had to be installed on each end cap. On average, plaintiff would assemble sixty-four (64) end caps per shift. Therefore, plaintiff would screw 832 screws into the end caps per day. The end caps weighed fifteen (15) pounds prior to assembly and between seventeen (17) and twenty (20) pounds after assembly.
6. Plaintiff worked forty (40) hours per week. Plaintiff would receive a break at 8:30 a.m., would have lunch between 11:45 and 12:15, and went home at 2:30 p.m.
7. After three (3) weeks of working at Ingersoll Rand, both of plaintiff's hands began to swell and hurt. She explained that she thought she was simply getting used to the job. *Page 4 
She asked her co-workers how long it took them to acclimate to the job and they mentioned that it took them approximately a month. However, plaintiff's co-workers recommended that she report her hand symptoms to "Ken." Plaintiff reported her hand symptoms and was informed by Ken Cormier to, "just see what you can do with it."
8. During that time, plaintiff had to switch the impact gun back and forth between her right and left hand because one hand would become exhausted and painful if she used it for any length of time. Plaintiff was also having pain in her left elbow because she was using the left side of her body to take the end cap down and put it back up. Plaintiff continued to have problems with her hands and left elbow despite switching the impact gun from hand-to-hand, and because of that, she reported the pain to Chris Harris. Ms. Harris informed plaintiff that she would get her in touch with the company nurse.
9. On May 2, 2008, plaintiff woke up to go to work at 4:00 a.m. for her 6:00 a.m. shift. Her left elbow was stinging and her wrists were frozen. The instructions to call out of work were to call Adecco first and Ingersoll Rand second. She called both facilities and informed them about her hand and left elbow symptoms.
10. At approximately 11:00 a.m., Ms. Harris called and asked plaintiff what was wrong. Plaintiff asked Ms. Harris if she remembered when she had informed her that her arms were hurting and Ms. Harris said she did. Plaintiff explained that her arms were now frozen and as a result, she could not perform her job. Ms. Harris asked if plaintiff could come to her office immediately because she would need to fill out a workers' compensation claim. Plaintiff went to Ms. Harris' office and they completed the workers' compensation form together.
11. Plaintiff returned to work and presented to the company nurse, Sybil Perrell, who provided her with Ibuprofen and black gloves, which plaintiff was informed would help with the *Page 5 
vibration from the impact gun. Plaintiff attempted to perform her job after taking the Ibuprofen and wearing the black gloves. Plaintiff explained that the pain did not go away in her arms and so she reported to Ms. Harris that she still had pain.
12. Plaintiff testified that, during the following week, she was suffering from excruciating pain, and she reported the same to her supervisor. On May 7, 2008, Ms. Perrell, the company nurse, drove plaintiff to Davie County Hospital. Plaintiff was diagnosed as having bilateral carpal tunnel syndrome and left lateral epicondylitis.
13. Plaintiff was instructed by defendant to present to ProMed on May 14, 2008. Plaintiff informed ProMed that she began working for Adecco on April 7, 2008, and on May 2, 2008, she awoke with "both hands `locked' and fingers unable to move them around." It is noted that plaintiff has had no improvement at all in her hands since May 2, 2008. Dr. David Russell of ProMed noted that her bilateral wrist exams were positive for a median nerve compression and Phalen's test. Dr. Russell conducted a physical examination of plaintiff's upper extremities and diagnosed her as having sprains and tendonitis in both wrists as well as a left elbow sprain. Dr. Russell ordered x-rays and requested approval for bilateral nerve conduction velocity studies.
14. On May 14, 2008, Dr. Russell assigned work restrictions of limited repetitive motion of her left and right upper extremities. Plaintiff testified that she could not perform her job at Adecco within those work restrictions. The nerve conduction tests were denied by the defendant. Plaintiff testified that she had never had pain in both hands or left elbow prior to May 2008. Plaintiff does not suffer from diabetes or high blood pressure.
15. Plaintiff was terminated by Adecco on May 14, 2008. Plaintiff explained that on the way to the hospital with Ms. Perrell, that Ms. Perrell had mentioned that plaintiff would have to participate in a drug test. Plaintiff communicated that would not be a problem and she would *Page 6 
be more than happy to provide a urine sample right then. Ms. Perrell informed plaintiff that they would go to the hospital first and would then get the drug test. At the hospital, plaintiff received a shot of Kenalog. Ms. Perrell informed her that she was going to take her to get the drug test and plaintiff informed Ms. Perrell that she knew that she was going to test positive because of the shot. Plaintiff did test positive on the drug test and was subsequently terminated by Adecco. Additionally, three (3) weeks prior, when plaintiff was hired by Adecco, she participated in a drug test, which was negative. After her termination by Adecco, plaintiff applied for unemployment benefits and was initially denied based upon the alleged "for cause" termination by Adecco. Plaintiff appealed the initial denial by the Employment Security Commission and won the appeal based upon the evidence that she had received the shot at the hospital prior to participating in the drug test.
16. Plaintiff has not returned to a physician for treatment for her hands or left elbow because she has no health insurance and cannot afford the treatment. Since April of 2008, plaintiff testified that she still has problems with her hands and that she's even beginning to drop things. Plaintiff reports that she still has fluid in her left elbow and it is painful.
17. Plaintiff explained that she has searched exhaustively for employment since her separation from Adecco. Plaintiff has not received one job offer since applying for unemployment benefits on June 25, 2008. Plaintiff is required by the Employment Security Commission to apply for two (2) jobs a week in order to receive her weekly unemployment benefits. Despite applying for at least two (2) jobs a week since June 25, 2008, plaintiff has not received any job offer.
18. Since September of 2008, plaintiff began taking care of her granddaughter, who is 2 years old, for 2 hours, 3 times a week. She earns $60.00 per week and $20.00 per 2 hour *Page 7 
sitting. Plaintiff is still looking for a job and is constantly on the internet searching for one, she does not have any trouble with her hands or left elbow while keeping her granddaughter because she microwaves her meals. Plaintiff testified she did not believe she could currently perform a job which would require her to lift more than ten (10) pounds because of the fluid in her left elbow and the pain in her hands.
19. Dr. Russell testified that impact guns "are a real common problem with causing or being related to carpal tunnel syndrome." Dr. Russell testified to a reasonable degree of medical certainty that there would be a high probability that plaintiff's job caused the problems she was having. Additionally, Dr. Russell testified to a reasonable degree of medical certainty that plaintiff's job would be a significant contributing factor to her development of her left wrist, left arm, and right hand problems. Although Dr. Russell only had the opportunity to evaluate plaintiff on one occasion, Dr. Russell testified that he would not recommend a full duty release to return to work if her symptoms had not resolved and she had not received the medical treatment that was recommended.
20. Dr. Sanford evaluated plaintiff on August 20, 2009, for the purpose of an independent medical examination per the request of defendant. Dr. Sanford did not believe that plaintiff's bilateral hand and left elbow conditions were causally related to her employment with Adecco.
21. Having considered the testimony of Dr. Russell and Dr. Sanford, taken with their expertise and relative treatment histories of plaintiff, the undersigned give greater weight to the testimony and expert opinions of Dr. Russell.
22. The greater weight of the evidence establishes that plaintiff's carpal tunnel syndrome in her bilateral wrists and her right lateral epicondylitis conditions are (1) *Page 8 
characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there is a causal connection between the disease and the [claimant's] employment.
23. Given the credible medical and vocational evidence of record, and as a result of her compensable occupational disease, plaintiff has been unable to earn any wages in any employment since May 14, 2008.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In workers' compensation cases, plaintiff has the burden of proving every element of compensability. As part of this burden, plaintiff must present convincing evidence establishing these elements, including, in this case, expert medical testimony.Holley v. ACTS, Inc.,357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003); Harvey v. RaleighPolice Department, 96 N.C. App. 28, 35, 384. S.E.2d 549, 553, disc. rev. denied,325 N.C. 706, 388 S.E.2d 454 (1989).
2. In order for an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), plaintiff must prove that the disease is characteristic of individuals engaged in the particular trade or occupation in which the plaintiff was engaged, that the disease is not an ordinary disease of life to which the public is equally exposed, and that there exists a causal relationship between the disease and the plaintiff's employment. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tutlex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983); Fann v. BurlingtonIndust., 59 N.C. App. 512, 296 S.E.2d 819 (1982); Booker v.Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979). *Page 9 
3. Plaintiff has proven by the greater weight of the evidence that the tasks required by her employment with defendant-employer placed her at greater risk than the general public of developing bilateral carpal tunnel syndrome and right lateral epicondylitis. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tutlex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983); Booker v. DukeMedical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
4. Plaintiff has proven by the greater weight of the evidence that the tasks required by her employment with defendant-employer caused her to develop bilateral carpal tunnel syndrome and right lateral epicondylitis. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tutlex Corp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983);Fann v. Burlington Indust.,59 N.C.App. 512, 296 S.E.2d 819 (1982); Booker v. Duke MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979).
5. Given the credible medical and vocational evidence of record, and as a result of her compensable occupational diseases, plaintiff was temporarily totally disabled and is entitled to compensation at the rate of $247.22 per week from May 14, 2008, until further order of the Commission. N.C. Gen. Stat. § 97-29; Russell v. Lowes Prod. Distribution,108 N.C. App. 762 (1993).
6. Subject to the provisions of N.C. Gen. Stat. § 97-25.1, plaintiff is entitled to have defendant provide all medical treatment, incurred or to be incurred, necessitated by the compensable occupational diseases. N.C. Gen. Stat. §§ 97-25; 97-25.1.
7. As defendant appealed this matter to the Full Commission and the Full Commission has concluded that plaintiff is entitled to an award of benefits, counsel for plaintiff is entitled to an attorney fee based upon hours spent by plaintiff's counsel on the appeal of this matter to the Full Commission as set forth by affidavit. N.C. Gen. Stat. § 97-88. *Page 10 
8. Contrary to defendant's argument, plaintiff is not required to make an election between a theory based on injury by accident or injury by occupational disease. See Handy v. PPG Industries,154 N.C. App. 311, 571 S.E.2d 853 (2002).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Defendant shall pay plaintiff, subject to the attorney's fee approved below, temporary total disability compensation at a rate of $247.22 per week from May 14, 2008, and continuing until further order of the Commission. Those payments that have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
2. Defendant shall pay all of plaintiff's medical expenses incurred or to be incurred as a result of the compensable occupational diseases, subject to the provisions of N.C. Gen. Stat. § 97-25.1.
3. An attorney's fee of twenty-five percent (25%) of the accrued back payment of TTD is approved for plaintiff's attorney. Thereafter, every fourth (4th) TTD check shall be made payable and forwarded to plaintiff's attorney until further order of the Commission.
4. Plaintiff's counsel is hereby ordered to file within fifteen (15) days from receipt of this Opinion and Award an affidavit of hours spent prosecuting plaintiff's claim on appeal before the Full Commission.
5. Defendant shall pay the costs.
This the 26th day of April, 2010. *Page 11 
 S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1